Freddie **LADWIG**, Plaintiff in Error,

v.

Lee **McGINNIS**, Defendant in Error.

No. 40183.

Supreme Court of Oklahoma.

Nov. 5, 1963.

As Amended Nov. 12, 1963.

Rehearing Denied Jan. 28, 1964.

858

Murphy & Evans, Kingfisher, for plaintiff in error.

John A. Ruth, Kingfisher, for defendant in error.

WILLIAMS, Justice.

Lee McGinnis, defendant in error, brought this action against Freddie Ladwig, plaintiff in error, Frank Williams, Von Williams and J. A. (Allen) Williams, partners; d/b/a Williams and Son Feed Company, and Williams Grain and Feed Co., Inc., a family corporation, for satisfaction of an unpaid negotiable instrument drawn on such corporation by Ladwig in payment for mung beans delivered to such partnership by McGinnis. The corporation's demurrer to the petition was sustained. A default judgment was entered jointly and severally against the partners. After trial to the court, judgment in the sum of $1,731.00, was rendered against Ladwig and he brings this appeal. The parties are referred to herein by name. Without deciding whether the instrument here involved is a check or a draft, we refer to it as a draft.

The facts as developed at the trial are that the partnership operated a business at Hennessey which was managed by Ladwig; that the nature of such business was custom feed-grinding and seed-cleaning and buying, selling and storing grain; that McGinnis told Ladwig he had some mung beans which he wanted to sell; that Ladwig, in his capacity as manager, agreed to buy the beans; that McGinnis delivered the beans at the place of business of the partnership and Ladwig in turn handed him a draft intending such to be the equivalent of cash; that such instrument is in words and figures as follows:

"CITIZENS NATIONAL BANK  Grain Purchase
  El Reno, Oklahoma                 Draft        No. 1005.
                                 Date 12–3–60
      Pay to the Order of Lee McGinnis —            $1731.00
      Seventeen Hundred Thirty One and 00/100 – – – – – – – – Dollars.
34620# Mung Beans at 5.00
                          WILLIAMS GRAIN & FEED CO., Inc.,
                            El Reno — Yukon — Hennessey
                          By, Freddie T. Ladwig";

that McGinnis deposited the draft in his local bank; that such draft was later returned to his bank with the following notation written on the face thereof: "signature not authorized".

McGinnis' evidence was to the effect that Ladwig's name was not on the corporation's signature card, at the Citizens National Bank in El Reno, authorizing Ladwig to draw drafts upon such account; that no officer or agent of the corporation authorized payment of the draft in question; that Ladwig did not advise McGinnis that before the draft would be paid by

the bank it had to be approved by the corporation or an official thereof; that no part of the purchase price of the beans has been paid.

Ladwig's evidence was to the effect that the form of draft filled in and used by him in the instant transaction was one of 2,000 furnished him by the corporation; that he had issued 755 such drafts; that the "biggest share of them" had been honored and paid; that Frank Williams, in advance of issuance thereof, authorized him to issue this draft to McGinnis; that he was paid a salary and did not receive a commission on the transaction here involved; that he had a bank signature card for the partnership's account at a Hennessey bank; that the corporate defendant sold the beans in Enid and the partnership delivered them to the carrier.

Frank Williams testified that he was a part owner of the business at Hennessey; that the corporation was owned by his two brothers and sister, his father's estate and himself; that he was secretary and treasurer of the corporation; that Ladwig had authority to sign the draft here involved; that perhaps it was illegal, but the corporation and the partnership were intermingled so closely that he didn't think a C.P.A. could have separated the two.

The trial court found that the instrument herein involved was a check; that the said corporation never at any time authorized Ladwig to execute and deliver any of said "checks" on said El Reno bank; that Ladwig did from time to time execute and deliver to customers of the partnership checks on the account of said corporation which were paid by the El Reno bank, but that in each such transaction the partners, officers of the corporation and the bank treated same as sight drafts, not checks; that Ladwig knew, or by the exercise of ordinary care and caution should have known, that unless and until the bank presented the check to some official of the corporation and secured the approval of the corporation, such check was worthless; that it was the duty of Ladwig to have informed McGinnis that he didn't have authority to execute checks and that such instrument would be treated as a sight draft and paid only when approved by the corporation or some official thereof; that when Ladwig issued the check under such circumstances he acted at his own peril and personally assumed the responsibility for the payment of the check.

For reversal Ladwig advances four propositions. In essence, his fourth proposition is that the findings, conclusions and judgment are contrary to the law and evidence.

The only testimony to the effect that Ladwig did not have authority to sign the draft was by the president of the bank on which the draft was drawn. He testified that Ladwig's name was not on the corporation's signature card on file with the bank; that the chief teller of the bank wrote the words "signature not authorized" on the draft here involved; that in the grain industry drafts and checks are used almost in the same sense; that on more than one occasion drafts written by Ladwig, such as here involved, were honored by the bank when approved by the corporation; that there may have been a few instances when the corporation's account was not sufficient to cover such a draft, and the bank wrote thereon "signature not authorized"; that as many as five drafts signed by Ladwig had been paid by the bank prior to the present one.

Frank Williams, (secretary and treasurer of the corporation), testified as follows:

"THE COURT: Then why wasn't it paid, if he was authorized to draw it?

"A. I would like to tell the court how we operated it, and I wouldn't dispute Mr. Croxtons' word for the world because he is an honest man and he is telling the truth and he has helped me for years, but what the Citizens Bank would do—this isn't an unusual way at all—this is the way we operated. What the Citizens Bank would do, every morning or when a draft was in, they would call me and say, or some

other officer in the office, and say, 'Your account needs so much money and there's a draft there from Mr. Ladwig,' or maybe—like I say, this wasn't unusual. Some mornings Freddie would have six or eight or ten drafts, and they would add up the drafts. Now I'm talking about when we had money, and they would add up the drafts and say, 'Your drafts from Hennessey are say two or three thousand dollars'. Then we would take our check book in the office and write a check to the bank for that amount and take it up to the bank window when we made our deposit and give them the check and pick up Freddie's drafts and then we would take them— they would be our drafts. They were handled always as drafts. And then later on as our business got bigger and we got shorter of capital, when a draft like this would come in, it was always nice because it would give us a day's leeway. When you are operating short of capital, you always try to buy or sell ahead or keep things going, and this was given with the intent of paying it. It's the only one that hadn't been paid and I owe it, but what I'm trying to prove to the court is that Freddie doesn't owe it. Me and my brothers owe it and we haven't taken bankruptcy.

"THE COURT: Was there money in that account down there at that time?

"A. Not enough to pay the draft, sir. I've heard so much about the signature not authorized, I always considered that a courtesy. Before this one wasn't paid all the way, there was other drafts that come down and maybe they would go back and then Fred would have them send them back again and we would have the money then to pick them up. And so I always figured this 'signature not authorized', I always appreciated it for the bank doing it because then it made it look—

when it gets out that you are short of money, you sure are gone, and that's what did happen in the end. And so if it went back this way—we knew it had to go back because we didn't have the money to pick it up. I always appreciated that being on there 'signature not authorized' instead of being turned down because that would give us another day or give us more time to try to hustle the money, you see * * *"

McGinnis in paragraph "3" of his amended petition alleged:

"That on December 3, 1960, Freddie Ladwig made, executed and delivered to the plaintiff, Lee McGinnis, a check upon Williams Grain & Feed Co., Inc., in the sum of $1,731.00, a copy of which check is attached hereto, marked Exhibit 'A' and made a part hereof as though here set out in full. Freddie Ladwig, at the time, represented that he had authority to receive said goods and to issue a check in full payment thereof, but that Freddie Ladwig was not in fact authorized to draw checks or drafts upon the Williams Grain & Feed Co., Inc., account in the Citizens National Bank at El Reno, Oklahoma, and he knowingly exceeded his authority and is jointly and severally liable to the plaintiff for the purchase price of said Mung Beans upon said evidence of indebtedness."

Frank Williams further testified that:

"Mr. Murphy: You did know that he was buying the mung beans and you authorized him to do what he did do?

"A. Yes. If we had had the money, this would have been picked up, but you can't pick up nothing without money * * *"

Ladwig testified that:

"Q. Now, Mr. Ladwig, as counsel has asked it and opened up this area, did you draw this draft with the understanding and belief that it was going to be honored down at El Reno immediately? Without any difficulty?

"A. They always had been. I mean the biggest share of the time it had been honored.

"Q. And nobody told you that you had to have the signature card in order to draw drafts?

"A. That's right.

"Q. Who brought up to you these books of drafts for you to use in your grain buying?

"A. Frank Williams."

The president of the bank did not testify that authority to cash the draft had to be in writing. He admitted that the bank previously had cashed drafts similar to the one here involved and that at such times, the bank did not have on file a signature card signed by Ladwig. Ladwig had the right to assume that the corporation would keep its word and authorize payment of the draft as it had many times in the past.

As we view the evidence, the reason the draft here involved was not paid was that there were insufficient funds in the corporation's bank account with which to pay same, and not that Ladwig was not authorized to draw it. If Ladwig's name had been on the signature card, the draft still could not have been paid. The controlling factor in this situation was the insufficiency of the corporation's bank account. Apparently, from the testimony, if the account had contained the necessary funds, the draft would have been paid in the same manner as those previously executed by Ladwig.

In issuing the draft here in question, Ladwig was acting within his authority as the agent of the corporation. As above indicated, prior to executing the draft, he discussed such with an officer of the corporation (Williams) and was authorized to issue the draft.

The agency of Ladwig and the name of his principal, the corporation, were indicated on the face of the draft. When McGinnis accepted the draft he was necessarily relying on Ladwig's authority to execute same, and the financial ability of the corporation, i. e., that the corporation had sufficient funds on deposit with the bank on which it was drawn to pay the draft. There is no testimony that McGinnis would have refused a draft in payment of the beans.

Mr. McGinnis has cited no rule of law requiring a bank signature card as a prerequisite to the payment of a negotiable instrument drawn on his principal's bank account by an agent. We know of no inhibition against the principal authorizing, by means other than a signature card, the payment of such an instrument, so drawn on such an account.

Sections 39 and 40 of Title 48 O.S. 1951, respectively, provide as follows:

"The signature of any party may be made by a duly authorized agent. No particular form of appointment is necessary for this purpose; and the authority of the agent may be established as in other cases of agency.

"Where the instrument contains or a person adds to his signature words indicating that he signs for or on behalf of a principal, or in a representative capacity, he is not liable on the instrument if he was duly authorized; but the mere addition of words describing him as an agent, or as filling a representative character, without disclosing his principal, does not exempt him from personal liability."

■ 10 C.J.S. Bills and Notes § 32, p. 446 contains the following language:

"Where an instrument showed that the signer affixed his signature, not intending to bind himself but intending to bind the person for whom he professed to sign, by the use of such words as * * * 'by' * * * it was construed as the obligation of the principal unless it contained other language excluding such interpretation, especially where the note indicated that the consideration inured to the principal."

■ The trial court's finding that the corporation at no time authorized Ladwig to execute and deliver any of said "checks"

on said El Reno bank does not appear to us to be supported by competent evidence.

In the case of Commerce Acceptance Co. v. Campbell, Okl., 368 P.2d 496, in the third paragraph of the syllabus, the Court said:

"In jury waived case, Supreme Court will examine evidence only to determine whether there is any competent evidence reasonably supporting trial court's findings and judgment, and where there is no evidence to support findings, judgment will be reversed."

Reversed.

WELCH, DAVISON, JOHNSON and JACKSON, JJ., concur.

BLACKBIRD, C. J., HALLEY, V. C. J., and IRWIN and BERRY, JJ., dissent.

HALLEY, V. C. J. (dissenting).

I dissent in this case because the defendant, Freddie Ladwig, had no authority to bind the corporation, Williams Grain and Feed Company, Inc., and did not do so. The demurrer of this corporation to the evidence in this case was sustained because it was shown that the defendant, Ladwig, was not an agent or employee of the corporation. There is no question but that he had no authority to draw on the bank account of the corporation.

Ladwig was responsible for the plaintiff, McGinnis, turning over the mung beans to Ladwig who in turn shipped them to Johnston in Enid. Ladwig's employer, the partnership Williams and Sons Feed Company, collected for the beans. Ladwig did not know whether the check or draft which he gave McGinnis was good or not. All such checks or drafts he issued had to be approved by someone in authority in the corporation. The corporation had never authorized the defendant, Ladwig, to draw on its bank account by giving a signature card to the Citizens National Bank in El Reno. The bank never paid on any drafts or checks signed by Ladwig unless it was approved by the corporation through its duly authorized agents. If Ladwig had issued drafts or checks on the corporation, he had no assurance that they would be taken up.

Frank Williams, a member of the partnership, Williams and Sons Feed and Seed Company, testified he gave Ladwig authority to draw the draft on the corporation. He never showed that he had the authority from the corporation to do so and he knew that the bank would not accept the draft on Ladwig's signature alone. Although there is no evidence in the record that the corporation, Williams Grain and Feed Company, Inc. of El Reno, Oklahoma, ever properly authorized Freddie Ladwig to draw drafts or checks on its account in the Citizens National Bank in El Reno, Ladwig purported to have such authority when he issued the draft or check to plaintiff, McGinnis.

I think that a proper interpretation of 48 O.S.1961 § 40, makes an unauthorized signer of a check or draft personally liable on a check or draft he issues. This Court has never passed on this question but many years ago Justice Cordozo, when a member of the New York Court of Appeals, wrote an opinion in which this question was disposed of. That was the case of New Georgia National Bank v. J. & G. Lippmann, 249 N.Y. 307, 164 N.E. 108, 60 A.L.R. 1344, and on this point he said: "We think the proviso that the agent or representative shall not be liable on the instrument 'if he was duly authorized' to sign, carries with it a fair implication that he shall be so liable if not authorized. * * *" The case at bar is a fine example of the fairness of the rule because we have a man disposing of the fruits of his labor for a consideration and losing it because the defendant pretended he had authority to draw on the funds of one not his employer and from whom he had no authority. Certainly the producer should have judgment against the unauthorized agent.

I dissent.